IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


JEANNE CARTER, as Special          )
Administrator for the Estate       )
of JUANITA MAYE WOODWARD,          )
Deceased,                          )
                                   )
                 Plaintiff,        )    CIVIL ACTION
                                   )
v.                                 )    No.  03-1156-MLB
                                   )
KENNETH A. CARLSON and NEW         )
RISING FENIX, INC.,                )
                                   )
                 Defendants.       )
_____)


**MEMORANDUM AND ORDER**

On September 13, and November 18, 2005, the court held Daubert[1] hearings with respect to the opinions to be offered by Byron Bloch, a witness designated by plaintiff as an expert.  The following were considered prior to the hearings:

   1.   Plaintiff's response to defendants Carlson and New Rising Fenix's motion for summary judgment (Doc. 207);

   2.   Defendants Carlson and New Rising Fenix's alternative motion to strike the declarations of Byron Bloch (Doc. 210);

   3.   Plaintiff's response to the alternative motion (Doc. 215); and

   4.   Defendants Carlson and New Rising Fenix's reply (Doc. 216).

These submissions raised several issues, including the scientific validity of some of Bloch's opinions.  Following the second

_____

[1]Daubert v. Merrell Dow Pharmaceuticals, Inc., 516 U.S. 869, 116 S. Ct. 189 (1995).

hearing, the court requested the parties to submit by letter brief their positions regarding issues which arose during the hearings. The letters, without their attachments, are as follows:

1. Plaintiff's counsel's letters of November 29, 2005 (Doc. 225) and

2. Defendants' counsel's letter of November 30, 2005 (Doc. 224).

The court is now prepared to rule on the issues pertaining to Bloch's opinions. A separate memorandum and order will be filed with respect to defendants Carlson and New Rising Fenix's motion for summary judgment.

## Background

This case arises out of a car-truck collision which occurred on September 10, 2002. Plaintiff's decedent died on May 9, 2003, as the result of complications from injuries she received in the collision. The case was filed the same day. The truck and semi-trailer involved in the collision were owned by New Rising Fenix and Kenneth Carlson was the driver. There is no dispute that Carlson was acting within the scope of his employment. Here follows a summary of the contentions and denials of the parties as set forth in the pretrial order (Doc. 171):

Plaintiff's decedent, Juanita Woodward, was a passenger in a Dodge Stratus automobile driven by Edgar Knobloch. Knobloch's Stratus was following the semi-trailer truck owned by New Rising Fenix and driven by Carlson. While the precise details of the collision are in dispute, it appears uncontroverted that Carlson was traveling west approaching a truck stop and preparing to turn left into the entrance when Knobloch's Stratus struck the rear of

the trailer.   The Stratus was traveling faster than the semi-trailer and, as a result, "underrode" the rear of the trailer, which, in turn, penetrated the passenger compartment of the Stratus striking Knobloch and Woodward.   Knobloch apparently died at the scene and, as previously stated, Woodward died several months later.

Federal regulations require "underride" or rear impact guards to be affixed to semi-trailers.   49 C.F.R. § 393.86.   At the time the lawsuit was filed, and for quite some time thereafter, plaintiff was under the impression that the "underride" guard on the trailer at the time of the collision was the same guard which was installed when the trailer was manufactured by Trailmobile Parts and Service Corporation in 1996.   Then, at some point, it was learned that the original "underride" guard was replaced in September 1999 by Springfield Trailer, Inc.   For reasons which are not particularly relevant at this juncture, plaintiff discovered that neither Springfield Trailer, Inc. nor Trailmobile Parts and Service Corporation could be held liable and plaintiff's complaints against them were dismissed in June 2005 (Docs. 208 and 214). However, prior to its dismissal, Springfield Trailer filed a motion to exclude the opinions of Bloch (Docs. 175-181) and after Springfield Trailer's dismissal, New Rising Fenix, as it were, picked up Springfield Trailer's ball and ran with it.

<u>Bloch's Reports and Opinions</u>

In his initial report dated December 2003, Bloch offered two opinions: (1) the 1996 Trailmobile guard was not of sufficient strength.   A stronger guard would have prevented the Stratus from

"underriding" the trailer which resulted in penetration of the trailer into the "survival space" of the Stratus, in which case plaintiff's decedent would have received only minor injuries. (2) ". . . it is likely that the New Rising Fenix driver utilized the Jake brake to decelerate . . . ."[2]  Bloch also opined that use of the "Jake brake" did not activate the stop lights on the trailer and that Knobloch was "likely unaware" that the New Rising Fenix truck was slowing.

In December 2004, after it was learned a replacement guard had been installed by Springfield Trailer in September 1999 and that welding repairs were done to the lower bar sometime in 2000, Bloch issued a second report.  He asserted, inter alia, that "Springfield Trailer could have fabricated and attached a rear guard that complied with Federal Motor Vehicle Safety Standards (FMVSS) 223 and 224, which had been promulgated in 1995 and were effective for all new trailers manufactured after January 26, 1998."  Bloch also opined that New Rising Fenix should have been aware of the deficiencies he, Bloch, found with respect to the replacement bar. Bloch asserted that New Rising Fenix should have installed a new, lower, wider, stronger, energy-absorbing bar which complied with FMVSS 223 and 224.

---

[2]The Jacobs Engine Brake® is a device that mounts on, or within, the engine.  It changes the timing of the engine exhaust valves, turning the engine into an air compressor. When activated, the highly compressed air in the cylinders is released through the exhaust system.  As a result, the energy of the vehicle's forward motion is dissipated and the vehicle slows without the necessity of applying the wheel brakes.  When the engine brake is engaged, the vehicle emits a loud and distinctive sound from its exhaust system.

Bloch also repeated his "Jake brake" theory but he modified and expanded upon the "facts" upon which he relied in his first report.  In his first report, Bloch rested his "Jake brake" opinion on the alleged statement of a truck driver named Danny McLane, who, in Bloch's words, "remembered hearing the distinctive sound of the engine compression 'Jake brake' being utilized to decelerate the New Rising Fenix truck . . . ."  In his second report, Bloch did not specifically mention Danny McLane.  Instead, Bloch identified Dale Scott who testified that he saw no brake lights on the New Rising Fenix trailer prior to the collision.

Bloch was deposed at length by defense counsel in February 2005.  Then, in April 2005, Carlson and New Rising Fenix filed a motion for summary judgment (Docs. 187 and 188).  Plaintiff responded and attached a lengthy "declaration" and a "supplemental declaration" of Bloch (Doc. 207, Exs. D and H) which also had been submitted in response to a motion for summary judgment filed by Springfield Trailer.  Carlson and New Rising Fenix then filed their motion to strike (Doc. 210) which is now before the court.

In his "declarations," which are much longer and more detailed than his first and second report combined, Bloch expounded at great length in defense of his opinions that the underride guard fabricated by Springfield Trailer was of a defective design, that the underride guard was not substantially constructed and that plaintiff's decedent would have survived the collision without serious injury if the underride guard had done its job.  Bloch asserted that his opinions were based on principles of biomechanical and occupant kinematics, not on medicine.  Bloch also

-5-

opined that New Rising Fenix had "poorly maintained" the underride guard and defended his use of "car-into-trailer" crash tests to come up with a newly-expressed opinion that there was a differential speed of about 40 mph between the Stratus and the trailer at impact, which, in conjunction with the defects he identified in the underride guard, was sufficient to compromise the effectiveness of the Status' airbags and seat belts, thereby allowing the rear of the trailer to penetrate into the "passengers' survival space."

Bloch reasserted his opinion that Carlson used the "Jake brake" but retreated from his opinion that Carlson did not apply the wheel brakes.  Faced with a trooper's report that the trailer's brake light bulbs indicated that the brake lights were on at the time of the collision, Bloch opined that "It is likely true that either instantly before the collision or as the collision was occurring, . . . the driver stepped on the service brakes, activating the brake lights . . . ."

Bloch issued a final "Supplemental Declaration" on May 17, 2005.  Bloch continued to defend the validity of his opinions against defendants' attacks that they are not based on scientific principles.  He repeated his views regarding the failure of the underride guard to comply with various regulations and offered a newly-minted opinion that Knobloch "likely" applied his brakes prior to the collision, notwithstanding the absence of any

skidmarks.[3]

Defendants' Positions

Carlson and New Rising Fenix move to strike contradictory statements and changed opinions present in Bloch's supplemental declarations to the extent that they deviate from his first and second report and his deposition testimony.  Defendants rely on the restrictions set forth in <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986) and <u>Rios v. Bigler</u>, 67 F.3d 1543, 1551 (10th Cir. 1995) and this court's Standing Order pertaining to motions for summary judgment.[4]  Defendants point to changes in Bloch's opinions regarding the vertical distance between the ground and the horizontal bar of the "underride" guard (22 versus 16-18 inches); his deposition testimony that he relied on "eye witness" testimony to support his opinion regarding the speed of the truck and semi-trailer at the moment of impact versus his later statement in his supplemental declaration that he did not rely on testimony of witnesses as to speed; Bloch's attempt to explain away unfavorable deposition responses by claiming that he "misinterpreted" or "misheard" counsel's questions; Bloch's citation to data from NHTSA

---

[3]Bloch also prepared a "Video Expert Report."  The date of the report is not in the record.  It is not mentioned in either his first or second reports.

[4]The Standing Order provides that supporting memoranda, including statements of material fact, authorities and argument, shall be limited to 30 pages.  Attachments contemplated by Fed. R. Civ P. 56(e) and D. Kan. Rule 56.1 are not subject to page limitation but no document may be attached whose purpose is to circumvent the 30 page limit (e.g., an appendix containing additional facts or argument).  Response and reply memoranda are similarly limited. Response and reply memoranda shall not exceed 30 and 10 pages, respectively. . . .

crash tests which were not mentioned in his first two reports and offering opinions not based upon facts.[5]

### Plaintiff's Positions

Plaintiff responds that Bloch's supplemental declarations do not violate the page limits of the standing order because the order specifically exempts attachments contemplated by Fed. R. Civ. P. 56(e) and D. Kan. Rule 56.1. Plaintiff asserts that Bloch's declarations are not retractions or rationalizations of his deposition testimony but rather are "logical explanations."

This court is always reluctant to make decisions by elevating form over substance. Bloch's supplemental declarations are made

---

[5]Two examples stand out, both dealing with the "Jake brake" issue. In his first report, Bloch stated as a matter of fact that Danny McLane heard the "Jake brake" utilized on the New Rising Fenix truck. He did not identify the source of this "fact," which is contrary to McLane's testimony from the excerpt provided by plaintiff in her response to the motion for summary judgment (Doc. 207, Ex. 14), McLane testified that he heard a "Jake brake" prior to the accident but that he was not sure where it was coming from. "It could have been another truck pulling over to the east side where there's a parking lot." McLane did not testify that he heard the New Rising Fenix truck use a "Jake brake."

In his second report, Bloch stated that Dale Scott testified that he saw no brake lights on the trailer. In the excerpt from his deposition testimony (id., Ex. 15), Scott testified that he saw the trailer's turn signal but could not recall seeing the brake lights. He admitted, however, that he wasn't "paying that much attention" to the brake lights, which is not the same as saying he saw no brake lights.

Even though Bloch incorrectly characterized McLane's testimony and selectively interpreted Scott's, Bloch nevertheless adhered to his opinion that Carlson did not apply his wheel brakes, an opinion which he later modified when he had to deal with the trooper's report regarding the brake light bulbs. At the very least, this is sloppy work. But more likely, it reflects opinions shaded in favor of plaintiff, who hired Bloch.

-8-

under the penalty of perjury and therefore technically may qualify
as affidavits and thus do not violate the local rule.
Nevertheless, the declarations are verbose, poorly-organized,
repetitive and difficult to follow.  It cannot be determined
whether Bloch did this deliberately or whether he just never
learned to write in a clear and organized way.  But because of
this, it is virtually impossible to resolve the competing arguments
of the parties as to exactly what Bloch wrote or said, as well as
when and in what context.  The court concludes that issues
surrounding the admissibility of Bloch's opinions can be resolved
by applying the Rules of Civil Procedure.

<u>Discussion</u>

Fed. R. Civ. P. 1 provides that the Rules of Civil Procedure
"shall be construed and administered to secure the just, speedy,
and inexpensive determine of every action."  Rule 83 provides for
the promulgation of local rules.  Rule 26 governs the disclosure
of expert testimony and provides that the disclosure regarding the
identity of an expert "be accompanied by a written report prepared
and signed by the witness.  The report shall contain a complete
statement of all opinions to be expressed and the basis and reasons
therefor; the data or other information considered by the witness
in forming the opinions; any exhibits to be used as a summary of
or support for the opinions . . ." as well as other matters.  The
Rule goes on to provide that "A party may depose any person who has
been identified as an expert whose opinions may be presented at
trial.  If a report from the expert is required under subdivision
(a)(2)(B), the deposition shall not be conducted until after the

-9-

report is provided." Rule 30(e) sets out the circumstances under which a deponent may make changes in a deposition.

These rules, read together, clearly provide that an expert witness must give a <u>complete</u> report of his opinions prior to the taking of his deposition. If this sequence is not followed, then the attorney taking the deposition can have no assurance that he or she is aware of all the expert's opinions. In short, the rule is intended to prohibit "sandbagging" and the game of "hide the ball," which, unfortunately, is all too prevalent with professional witnesses who view their role as that of an advocate for the party by whom they were retained. There is no provision anywhere in the rules for expert opinions given at a deposition to be corrected or embellished by a "supplemental declaration."

Rule 56 provides, in pertinent part:

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

* * *

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

There is nothing in Rule 56 which authorizes a party opposing a

motion for summary judgment to do so with extensive "supplemental declarations" such as those of Bloch.  Plaintiff never requested permission to utilize such "supplemental declarations" and if she had, the court would have refused permission because they plainly are far beyond the scope of Bloch's written reports about which he was deposed.  Even if plaintiff's and Bloch's purpose in preparing the "supplemental declarations" was intended as an entirely innocent method of responding to defendants' motion, the methodology is not authorized by the rules and is improper.

Local Rule 56.1 tracks Rule 56 and provides, in pertinent part:

> (d) Presentation of Factual Material.  All facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answer to interrogatories and responses to requests for admissions. Affidavits or declarations shall be made on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence. Where facts referred to in an affidavit or declaration are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document shall be attached.
>
> (e) Duty to Fairly Meet the Substance of the Matter Asserted. If the responding party cannot truthfully admit or deny the factual matter asserted, the response shall specifically set forth in detail the reasons why. All responses shall fairly meet the substance of the matter asserted.

Once again, there is no provision in our local rule for "supplemental declarations" of the type submitted by Bloch.

In conclusion, after reviewing the parties' submissions and Bloch's reports and "supplemental declarations," the court finds that defendants' motion to strike shall be granted to this extent: Bloch's opinions shall be limited to those set forth in his first

-11-

two reports and to his deposition testimony relating to the contents of his first two reports. Bloch's "supplemental declarations" shall be stricken and may not be relied upon by plaintiff to oppose Carlson and New Rising Fenix's motion for summary judgment, nor may their contents form the basis of Bloch's testimony at trial.

<u>Scope of Use of Bloch's First Two Reports</u>

The next issue concerns whether, and to what extent, Bloch can offer the opinions expressed in his first and second reports. Resolution of this issue requires consideration of Rules 403 and 702 of the Federal Rules of Evidence and, to a lesser extent, the gate-keeping role established in <u>Daubert</u>.

Regardless of his qualifications, an expert witness may not give testimony which is neither reliable nor helpful to the jury. An expert witness does not assist the jury in determining whether an event occurred if he starts his analysis using an assumption that the event occurred. <u>Cf.</u> <u>Clark v. Takata Corporation</u>, 192 F.3d 750, 757 (7th Cir. 1999) ("simply put, an expert does not assist the trier of fact in determining whether a product fails if he starts his analysis based on the assumption that the product failed (the very question that he was called upon to resolve), and thus, the court's refusal to accept and give credence to [the expert's] opinion was proper.")

These principles have obvious application to Bloch's opinion that Carlson used the "Jake brake" prior to the collision. Bloch was not at the scene, of course, and therefore has no direct knowledge of what occurred. His opinion was initially based on the

-12-

incorrect assumption that Danny McLane heard the sound of a "Jake brake" from the New Rising Fenix truck.  In his second report, Bloch sought to shore up his "Jake brake" theory with the statement that Dale Scott saw no brake lights on the trailer.  But as pointed out, Scott did not give positive, unequivocal  testimony regarding the brake lights.  Because jurors may not be familiar with function and operation of a "Jake brake," Bloch's testimony on those limited factors presumably will be helpful to the jury.  But jurors will not require Bloch's opinions to evaluate the testimony of witnesses regarding what they saw and heard at the time of the collision and whether or not Carlson's use of the "Jake brake," if it occurred, was a causative factor in the collision.

A related conclusion drawn by Bloch is that when Carlson "started to use his directional turn signal to indicate his intent to make a left turn . . . and he may have finally applied the service brake (causing the brake lights to come on) . . . Edgar Knobloch was surprised by the imminent danger ahead [but] it was too late for Edgar Knobloch to steer the Dodge Stratus completely around the right side of the trailer."  Once again, the jury presumably will hear testimony from various witnesses regarding circumstances at the scene of the collision, including the lack of skidmarks, the areas of impact between the vehicles and the location of the vehicles after impact.  Using this evidence and instructions regarding the rules of the road, the jurors will be able to determine what the drivers did, or failed to do, before and during the collision sequence.  Bloch's opinions that Carlson "may have finally applied the service brake" and that "Knobloch was

-13-

surprised by the imminent danger ahead" will not be helpful to the jury and, in any event, are speculation.  All of Bloch's opinions regarding the actions of the drivers prior to the collision will be excluded.

Next, the court will consider the admissibility of Bloch's opinions regarding the severity of plaintiff's decedent's injuries. In his first report, Bloch opined that the Stratus's "crush zone" and airbags were compromised by the weak rear guard, allowing excessive underride.  He asserted that an adequate rear guard would have "prevented" penetration of the trailer into the Stratus "survival space" and that "the occupants would have been able to ride-down the deceleration forces aided also by the inflated airbags and, for Juanita Woodward, the lap-and-shoulder safety belt that she was wearing."  Bloch concluded that, but for these events, "Woodward would not have occurred the severity of injuries."  Later in the same report, Bloch opined in conclusory fashion that "but for the defects in the Trailmobile Trailer, with its defectively designed and weak rear guard device, Juanita Woodward and Edgar Knobloch would have been expected to receive minor, non-disabling injuries."  These opinions are repeated in Bloch's second report.

There is nothing in Bloch's first and second reports, nor in the materials referenced in the reports, which show that he is qualified to offer opinions regarding the nature and extent of the injuries plaintiff's decedent would, or would not, have received. In his "supplemental declarations," Bloch sought to buttress his qualifications to state such opinions by reliance on crash test data and his "video expert report," characterizing his opinions as

-14-

"biomechanical and occupant kinematics" rather than medical. However, the crash test data which Bloch claims to have relied upon as demonstrating forces "similar to forces that would be expected to have been applied to Juanita Woodward's body in the subject's accident" (DOT crash test 2676) is not identified in the list of sources attached to his first and second reports. Moreover, there is nothing in his first and second reports which supports Block's assertion that he has expertise in "biomechanical and occupant kinematics."

The jury will be able to determine from Bloch's testimony and photographs of the wrecked vehicles the extent to which the trailer "penetrated" into the Stratus. The nature and extent of plaintiff's decedent's injuries can be, and presumably will be, established by competent medical testimony. The jurors will be able to determine from the evidence whether the injuries plaintiff's decedent sustained caused, or contributed to cause, her subsequent death. Bloch's opinions regarding the injuries plaintiff's decedent would <u>not</u> have received lack scientific foundation and reliability and will not be helpful to the jury.

So, what testimony and opinions of Bloch can be considered in response to defendant's summary judgment motion and, if appropriate, at trial? It is helpful, at this point, to refer to plaintiff's contentions and theories of recovery in the pretrial order.

<u>Contentions</u>

11. The "underride guard" which was contained on the trailer when it left the manufacturer's hands was replaced in September, 1999 by Springfield Trailer, Inc.

-15-

with a so called guard fabricated from various parts
purchased by Springfield Trailer, Inc. Such so-called
"underride guard" fabricated by Springfield Trailer did
not meet the Federal Motor Vehicle Safety Standards in
effect either at the time the trailer left the
manufacturer's hands or at the time the so called
fabricated "underride guard" was fabricated by
Springfield nor did it meet the industry standard
promulgated by the Truck Trailer Manufacturers
Association. Further such fabricated so called "underride
guard" was fabricated of materials that were not
adequately corrosion resistant which resulted in
accelerated corrosion which weakened the metal of the
fabricated parts further contributing to the so called
guards catastrophic failure to provide underride
protection. Because of the defective nature of the
fabricated so called "underride guard" the guard was
subject to accelerated wear and damage from backing into
loading docks which resulted in the necessity of high
maintenance additional bracing by New Rising Fenix.
Because of such defects, the fabricated so called
"underride guard" quickly deteriorated and provided no
protection to prevent vehicles from "underriding" the
rear of the trailer and provided no such protection to
prevent the Dodge Stratus being driven by Edgar Knobloch
from "underriding" the trailer in the subject accident.

15.   New Rising Fenix, permitted the trailer to be
operated upon the public highways in such defective
condition described above and without proper maintenance
and/or inspection.

### Theories of Recovery

1.A.   New Rising Fenix, Inc. was negligent per se by
violating Federal Motor Carrier Safety Regulations, 49
CFR 392.7, 49 CFR 393.86(b)(1), 49 CFR 396, 49 CFR 396.1,
49 CFR 396.7(a), and 49 CFR 396.17, permitted the trailer
to be operated upon the public highways in such defective
condition described above and without proper maintenance
and/or inspection.

1.B.   New Rising Fenix, Inc. was negligent in failing to
ensure the replacement of the so called "underride guard"
complied with then existing Federal Motor Vehicle Safety
Standards 223 & 224 and standards of the Truck Trailer
Manufacturing Association for such guards.

(Doc. 171 at 6-8 and 11).

In his first and second report, Bloch covers in some detail

the problem of "underride" and the role of "underride" guards.  In

-16-

their motion, defendants do not assert that Bloch is unqualified to give the opinions expressed in his first and second reports on these matters and the court finds that he is qualified by scientific, technical or other specialized knowledge to assist the jury to understand the evidence regarding "underride" guards in general and the "underride" guard on the New Rising Fenix trailer in particular.  Fed. R. Evid. 702.

Nevertheless, there is an exception to the extent to which the court will permit Bloch to testify about "underride" guards. Plaintiff asserts that the "underride" guard did not meet the specifications required by federal regulation and seeks to offer Bloch's testimony on this subject to support a claim of "negligence per se."  It is this claim that the court requested the parties to brief by letter.

The parties <u>generally</u> agree that New Rising Fenix was required to comply with the requirements of 49 C.F.R. § 393.86 which deals with the subject of "rear impact guards and rear end protection" for semi-trailers such as that owned and operated by New Rising Fenix.  In other words, it is not disputed that the New Rising Fenix semi-trailer had to be equipped with a rear impact or "underride" guard.  The issue which concerned the court dealt with whether subsections (a) or (b) (or both) of § 393.86 applied to the relevant dates pertaining to the "underride" guards on the trailer.

In the pretrial order, the parties agree that the law applicable to the case included 49 C.F.R. § 393.86(b)(1) (Doc. 171 at 3).  Subsection (b)(1), by its terms, sets out "requirements for motor vehicles manufactured after December 31, 1952 (except

-17-

trailers or semi-trailers manufactured on or after January 26, 1998). Subsection (b)(1) goes on to specify such things as the vertical distance between the bottom of the guard and the ground and other dimensional characteristics. Subsection (b)(2) requires that the "rear impact guard(s) must be substantially constructed and attached by means of bolts, welding, or other comparable means." As previously noted, the New Rising Fenix trailer was manufactured in 1996 which, of course, is after December 31, 1952 and before January 25, 1998. There is no question that the jury must be instructed on § 393.86(b) and that Bloch's testimony regarding the requirements of that section will be admissible.

Subsection (a) specifically sets out the "general requirements for trailers and semi-trailers manufactured on or after January 26, 1998." Subsection (a)(1) provides that the rear impact guard must meet the requirements of Federal Motor Vehicle Safety Standard Number 223 (49 C.F.R. 571.223) and number 224 (49 C.F.R. 571.224). The requirements of FMVSS numbers 223 and 224 are more rigorous and extensive than those set forth in subsection (b)(1).

In his first report, Bloch commented generally regarding "stronger rear guards [which] have been crash tested over the years" and opined that "in contrast, the 1996 Trailmobile rear guard appears to have a strength of less than 30,000 pound resistive load, based upon a design analysis, prior testing of similar (but not identical) Trailmobile guards, and documents provided by Trailmobile." Bloch did not opine whether the Trailmobile guard installed as original equipment on the New Rising Fenix trailer met, or failed to meet, the requirements of § 393.86.

-18-

In his second report, written after Bloch became aware that the original equipment guard had been replaced in 1999 and then repaired in 2000, Bloch opined that "New Rising Fenix should have required that Springfield Trailer provide, and Springfield Trailer should have provided, a proper and adequate replacement guard that would have met the then-current Federal Motor Vehicle Safety Standards (FMVSS 223 and 224)."  Since FMVSS 223 and 224 are mentioned only in § 393.86(a), the court must assume that Bloch came to believe that subsection (a)(1) somehow is relevant to this case.  Interestingly, plaintiff's counsel does not appear to share Bloch's apparent belief.

Plaintiff's position regarding the applicability of § 393.86 is set forth per counsel's November 29, 2005 letter (Doc. 225). The following paragraphs summarize plaintiff's position:

> As discussed below, §393.86(b) is the section the law mandates New Rising Fenix be in compliance and violation of §393.86(b) would be negligence per se.  As shown below, the New Rising Fenix impact guard did not comply with §393.86(b), not because it did not comply with Federal Motor Vehicle Safety Standards ("FMVSS") 223 and 224, but because it did not comply with the language of §393.86(b), which requires such guards to be of "substantial construction."  Moreover, as discussed below, the Federal Motor Vehicle Safety Standards referenced in §393.86(a) may be used as some evidence of what would be considered by the trucking industry, after 1998, to be a safe, adequate impact guard, which would have satisfied New Rising Fenix's duty created by custom and usage under the common law to provide such a safe adequate guard when it was replaced in 1999.  But violation of §393.86(a) would not be negligence per se.
>                                     * * *
>
> In §393.86(b)(1), the section that is mandatory as it relates to New Rising Fenix states: "The rear impact guards must be **installed** and **maintained** in such a manner that:" (setting out criteria such guard must meet). (Emphasis and parenthetical expletive ours.)  Therefore, it is clear that §393.86(b) requires guards installed by

-19-

anyone (even though not original equipment) to be both installed and maintained pursuant to §393.86(b). Nowhere does there appear an exception for guards that are not original equipment. The word "maintained" is clearly intended to ensure the guard actually on the truck during operation continues to comply with §393.86(b).

* * *

The original guard was replaced in 1999 with the "fabricated," "untested" underride guard fabricated with Pines Trailer Vertical Struts and other parts secured from unknown sources. Such replacement guard did not comply with §393.86(b)(2) which requires: "The rear impact guards must be substantially constructed . . ."

* * *

Therefore, it is a question of fact for the jury to decide as to whether the New Rising Fenix underride guard complied with 49 CFR §393.86(b) for trailers manufactured after 1952 but before 1998 and whether such guard was or was not of "substantial construction." As stated above, compliance with 49 CFR §393.86(b) is the responsibility of motor carriers such as New Rising Fenix, not the trailer manufacturer.

* * *

Even if it could be said that New Rising Fenix was not required by law to comply with 49 CFR §393.86(a), which relates to trailers manufactured after 1998, and thus could not be negligent per se, the Federal Motor Vehicle Safety Standards for underride guards adopted therein, which sets out design criteria for such guards, would be some evidence of what was, in 1999 (when the fabricated guard was installed), considered to be a guard of "substantial construction" as required by §393.86(b). Safety Standards, adopted by law, even though not mandated by law to be followed by a Defendant are considered admissible to establish ordinary and reasonable care and what is considered to be a safe practice.

* * *

Therefore, Byron Bloch's testimony that the impact guard was not of "substantial construction," and as a consequence in violation of §393.86(b) for trailers manufactured after December 31, 1952, but before January 26, 1998, is properly admissible. His testimony that New Rising Fenix violated the custom and usage of the industry by not ensuring the impact guard minimally

-20-

complied with Federal Motor Vehicle Safety Standards is properly admissible.

Defendants' position set forth in its letter of November 30, 2005 (Doc. 224) is that <u>only</u> § 393.86(b) applies.  Defendants do not address plaintiff's contention that § 393.86(a) may be relevant to whether § 393.86(b) was complied with.  In order to determine whether § 396.86(a) is relevant in addressing the issue of "substantially constructed," the court has looked to the legislative history of the regulations.

The earliest date that rulemakers first proposed additions to FMVSS 223 and 224, later incorporated into § 396.86(a), occurred in January 1981.  <u>See</u> 46 F.R. 2136-01 (Jan. 8, 1981).  At that time, NHTSA noted that previous rulemaking efforts, in 1971, attempted to impose additional requirements on rear underride guards.  The proposed rule had a load requirement of 50,000 pounds (the current requirement under § 396.86(a)), to be applied with a test block at the center and at both sides.  46 F.R. 2136, 2137. Those rulemaking efforts were terminated after a determination that the benefits outweighed the cost of implementation ($500,000,000).

NHTSA was still determined to resolve the ongoing problem of rear underride.  Accordingly, a rule quite similar to the requirements now found at FMVS 223 was proposed:

> S6.6. Using the test block, subject the underride guard to the tests specified in paragraphs (a) and (b) of this section, as shown in Figure 2. An underride guard that has not been subjected to either of the tests is used for each test.
> (a) Test 1. Apply a force (P1) of 50,000 Newtons (11,240 pounds) to the guard 30 cm (11.8 inches) inboard of the longitudinal vertical plane tangent to the outermost

-21-

point on the sides of the vehicle (either the right or the left side), and then apply a force (P2) of 50,000 Newtons (11,240 pounds) to the same guard where it intersects the longitudinal vertical plane passing through the vehicle longitudinal axis.
(b) Test 2. Apply a force (P3) of 100,000 Newtons (22,480 pounds) to the guard at any point not less than 35 cm (13.8 inches) and not more than 50 cm (19.7 inches) to the left of the longitudinal vertical plane passing through the vehicle longitudinal axis, and then apply the same force to the same guard at the point located at the same distance to the right of that plane.

46 FR 2136, 2143 (January 8, 1981).

The initial question before the court is whether these proposed regulations could assist the jury in determining whether the bar on defendant's trailer was "substantially constructed." The court has determined that the answer is "no."  In proposing this regulation, the rulemakers noted that an alternative was to apply the current regulation, § 393.86(b), to all trucks greater than 10,000 pounds.  This alternative was rejected since the standard of "substantially constructed . . . does not insure that all underride devices are <u>at least minimally capable of preventing excessive underride</u>." 46 F.R. 2136, 2141 (emphasis supplied).  The rulemakers apparently felt that a new regulation was necessary "because of the continuing problem of fatalities and serious injuries occurring in accidents involving excessive underride, and because of the <u>absence of efforts by the vehicle manufacturers generally to go sufficiently beyond the [§ 393.86(b)] requirement</u>." 46 F.R. 2136, 2137(emphasis supplied).  These comments support the obvious conclusion that guards that are acceptable under § 393.86(b), may not comply with FMVSS 223 and 224, a conclusion which is supported by later comments concerning the rule made in

-22-

1992.  "The agency estimates that few, if any, present guards would meet the proposed strength and configuration requirements."  57 F.R. 252, 255-256 (Jan. 3, 1992).  But none of the proposals define "substantially constructed."[6]

The next question is whether § 393.86(a), which incorporates the more stringent requirements of FMVSS 223 and 224, is relevant to the jury's determination regarding whether the "underride" guard was "substantially constructed" as required by § 393.86(b).  Once again, the answer is "no."  The jury's decision will not be assisted by evidence of requirements which were not in force and with which New Rising Fenix was not required to comply.  The evidence will be excluded by Fed. R. Evid. 403.  Bloch's testimony will be limited to the requirements of § 393.86(b).

<u>Conclusion</u>

Byron Bloch's two supplemental declarations are excluded. Bloch's opinions on whether Carlson used the Jake Brake, the injuries plaintiff would or would not have sustained if a different guard had been on defendant's trailer, the actions of the drivers and the applicability of FMVSS 223 and 224 are also excluded.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a

---

[6]The court notes in passing that while Bloch touts his extensive 35-year involvement with the "underride" problem, none of his reports and declarations mention the proposed regulations. It does not appear that he participated in any of the proposed rulemaking.

party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   22nd   day of December 2005, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE